**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> PATRIOT BEVERAGES, LLC; and CPF, INC., <br><br> Defendants. | Case No. 24-_____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1388) |

## INTRODUCTION

1.      Plaintiff Conservation Law Foundation, Inc. ("CLF") brings this citizen suit under

Section 505(a) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33

U.S.C. § 1365(a) for civil penalties, declaratory and injunctive relief, and such relief as may be

necessary to address CWA violations by Defendant Patriot Beverages, LLC and Defendant CPF,

Inc. (collectively, "Defendants").

2.      Defendants own and operate a Pepsi-product manufacturing and bottling facility (the

"Facility") and are subject to a National Pollutant Discharge Elimination System Permit (the

"Permit"), Permit No. MA0004936.[1]

3.      Defendants have discharged and continue to discharge wastewater and stormwater into

Reedy Meadow Brook and Mill Pond in violation of their CWA permit by: 1) exceeding

---

[1] U.S. EPA, NPDES PERMIT NO. MA0004936 (2013),
https://www3.epa.gov/region1/npdes/permits/2013/finalma0004936permit.pdf [hereinafter the "Permit"].

numerical effluent limitations, including for phosphorus, total suspended solids, pH, biochemical oxygen demand, temperature, and aluminum; 2) violating the Massachusetts' state water quality standards; 3) violating narrative effluent limitations; 4) failing to minimize discharge of pollutants in stormwater; 5) failing to take and document corrective action after violations of stormwater effluent limitations; and 6) violating monitoring and reporting requirements.

4.      Defendants discharge pollutants that are harmful to human health and aquatic life and diminish CLF's members' use and enjoyment of Reedy Meadow Brook and Mill Pond.

5.      Upon information and belief, Defendants have not taken any actions sufficient to prevent future violations of the type alleged in this Complaint.

6.      Absent an appropriate order from this Court, Defendants are likely to repeat their violations of the CWA.

### JURISDICTION AND VENUE

7.      Plaintiff invokes this Court's subject matter jurisdiction under 33 U.S.C. § 1365 (citizen suit provision), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 2201 (declaratory judgment); and 15 U.S.C. § 1116 (injunctive relief).

8.      Plaintiff seeks relief that the Court has authority to grant. 33 U.S.C. § 1365(a); 28 U.S.C. §§ 2201–02; 15 U.S.C. § 1116.

9.      Defendants' violations of the CWA are subject to enforcement under the citizen suit of the CWA. 33 U.S.C. § 1365(a)(2).

10.      Plaintiff is a "citizen" under the CWA citizen suit provision and has authority to bring this lawsuit. *Id.* §§ 1365(g), 1362(5).

11.      On April 10, 2024, Plaintiff, by and through their counsel, notified Defendants and their agents of CLF's intent to file suit under the CWA in a letter via certified mail ("Notice Letter"). 33 U.S.C. § 1365(b)(1); 40 C.F.R. §§ 135.2, 135.3.

12.     A true and accurate copy of Plaintiff's Notice Letter is attached as Exhibit 1. The Notice Letter is incorporated by reference herein.

13.     Each Defendant received the Notice Letter. Copies of the return receipts are attached as Exhibit 2.

14.     Plaintiff also sent copies of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region 1; the Massachusetts Department of Environmental Protection ("MassDEP"); and the Citizen Suit Coordinator.

15.     Each entity identified in the preceding paragraph received the Notice Letter. Copies of the return receipts are attached as Exhibit 3.

16.     More than sixty days have elapsed since Plaintiff mailed Defendants the Notice Letter, during which time neither EPA nor the Commonwealth of Massachusetts has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

17.     The CWA violations alleged in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to reoccur. Defendants remain in violation of the CWA.

18.     Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391(e) and 33 U.S.C. § 1365(c) because the sources of the violations are located within this judicial district.

## **PARTIES**

**Plaintiff**

19.     Plaintiff CLF is a nonprofit, member-supported environmental advocacy organization dedicated to protecting New England's environment. CLF works on behalf of its New England-wide membership and with other environmental and community-based organizations to enforce environmental laws, including the CWA.

20. Since 1966, CLF has worked to protect the health of New England's water resources, including addressing sources of wastewater and stormwater pollution.

21. CLF has over 5,700 members in New England. CLF members live, work, recreate, and spend time near Reedy Meadow Brook and Mill Pond in Littleton, MA.

22. The Facility's wastewater and stormwater discharges impair the recreational and aesthetic uses of Reedy Meadow Brook and Mill Pond by harming fish, birds, and other wildlife; contributing to objectionable discoloration; unpleasant scum, foam, and odor; increasing toxic pollution; and reducing the use and enjoyment of the waterbodies by CLF members.

23. CLF members use Reedy Meadow Brook and Mill Pond to kayak, canoe, fish, walk, irrigate, and observe wildlife. They value the waterways' scenic beauty, wildlife, avian and aquatic habitat, and natural resources.

**Defendants**

24. Defendant Patriot Beverages, LLC is a corporation incorporated under the laws of Massachusetts.

25. Defendant Patriot Beverages, LLC owns and operates a Pepsi-product beverage manufacturing and bottling facility at 20 Harvard Road, Littleton, MA 01460 (the "Facility").

26. Defendant CPF, Inc. is a corporation incorporated under the laws of Massachusetts.

27. Defendant CPF, Inc. is the parent company of Defendant Patriot Beverages, LLC and controls the Facility.

28. CPF, Inc. maintains several manufacturing, production, shipping, and bottling facilities in Massachusetts.

29. CPF, Inc. is a member of Pepsi-Cola Bottlers' Association.

30. Defendants, and their agents, and directors, are persons as defined by Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

31.     Defendants are responsible for ensuring that the Facility operates in compliance with the CWA.

**STATUTORY AND REGULATORY BACKGROUND**

**The Clean Water Act**

32.     The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). This purpose includes the elimination of "the discharge of pollutants into the navigable waters" and attainment of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* §§ 1251(a)(1), (2).

33.     The CWA prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit applicable to that point source. *Id.* §§ 1311(a), 1342.

34.     Under the CWA and its implementing regulations, the "discharge of a pollutant" is defined as "[a]ny addition of any 'pollutant' or combination of 'pollutants' to 'waters of the United States' from any 'point source.'" 40 C.F.R. § 122.2; *see* 33 U.S.C. § 1362(12).

35.     A "pollutant" is any "solid waste," "chemical wastes, biological materials," "wrecked or discarded equipment, rock, sand," and "industrial . . . waste" discharged into water. 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

36.     The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). "Waters of the United States" are defined by EPA regulations that include, *inter alia*, all tributaries to interstate waters. 40 C.F.R. § 120.2(a).

37.     "Point source" is defined broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

38.     Section 402 of the CWA requires NPDES permits to be issued for wastewater and certain stormwater discharges. *Id.* §§ 1342(a)(1), (p)(2), (p)(3)(A), (p)(4), (p)(6).

39.     To discharge pollutants into waters of the U.S. lawfully, Section 402 requires industrial facilities to obtain coverage under a NPDES permit and comply with its terms. *Id.* § 1342.

**Citizen Enforcement Suits Under the Clean Water Act**

40.     The CWA authorizes citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation. . . or an order issued by the Administrator or State with respect to such a standard or limitation." *Id.* § 1365(a)(1).

41.     An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." *Id.* § 1362(11).

42.     Such enforcement action under Section 505(a)(1) of the CWA includes an action seeking remedies for unauthorized discharges under Section 301 of the CWA, *id.* § 1311, as well as for violations of a permit condition under Section 505(f), *id.* § 1365(f).

43.     Each separate violation of the CWA subjects the violator to a penalty of up to the maximum amount allowed pursuant to Sections 309(d) and 505(a) of the CWA. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

**STATEMENT OF FACTS**

**The Facility's Operations**

44.     The Facility manufactures Pepsi beverages from raw ingredients and materials and bottles such beverages, including Gatorade products, Propel Water, LifeWTR, and Pure Leaf teas. PepsiCo, Inc. provides the recipes for such products.

6

45.    Beverages are mixed in a tank in accordance with PepsiCo, Inc. recipes. The manufacturing process includes reverse osmosis, which removes certain chemicals from manufactured beverages.

46.    The beverages are bottled on bottling lines that are cleaned by clean-in-place systems, which is an automated method of cleaning equipment.

47.    After filling, the bottled beverages run through spray cooling and disinfection tunnels.

48.    After the spray cooling and disinfection tunnels, the bottled beverages are palletized, shrink-wrapped and stored.

49.    The Facility discharges wastewater and stormwater to Reedy Meadow Brook at waterbody segment MA84B-01. Permit at 48, Fact Sheet at 1.

50.    Reedy Meadow Brook drains into the North Basin of Mill Pond 0.7 miles downstream from the Facility at waterbody segment MA84038. *See id.* at 53, Fact Sheet at 6.

<u>Wastewater Discharges</u>

51.    The Facility discharges reverse osmosis reject water, reverse osmosis backwash water, contact cooling water, non-contact cooling water, process wastewaters from the cooling tunnels, vessel and line clean-in-place rinses, floor wash-downs, waste beverage batches, and cooling tower blow-downs (collectively, "wastewater"). *Id.* §§ I.A.1–2 at 2, 7.

52.    There is a tank farm at the Facility with fourteen aboveground, steel tanks ranging in size from 12,000–50,000 gallons in size that store liquid ingredients and wastewater.

53.    Upon information and belief, at least as of March 31, 2024, Defendants receive off-site beverage wastewater from EPIC Enterprises, Inc. and Defendant CPF, Inc. *Id.* §§ I.A.1 n.1, I.A.D at 4, 12.

54.    EPIC (Enjoy-Pepsi-In-Cans) Enterprises, Inc. is a subsidiary of PepsiCo, Inc. and manufactures and cans Pepsi beverages. EPIC's facility is located at 11 Copeland Drive, Ayer, MA 01432.

55.    The Permit identifies the following pollutants in the Facility's wastewater discharges, *inter alia*: phosphorus, total suspended solids, excess pH, biochemical oxygen demand, thermal pollution, and aluminum.

Stormwater Discharges

56.    The Facility's stormwater drainage system consists of 1) a retention basin in the yard, and 2) stormwater catch basins near the tank farm.

57.    The Facility's retention basin in the yard holds water from building roofs and parking lot drains, including stormwater associated with materials storage, processing, handling, blending, loading, and unloading of product, and lawn maintenance. The retention basin discharges stormwater directly to Reedy Meadow Brook.

58.    The Facility has stormwater catch basins near the tank farm, which drain to the wastewater treatment plant.

59.    The Permit identifies the following pollutants in the Facility's stormwater discharges, *inter alia*: phosphorus and total suspended solids.

60.    Upon information and belief, during every measurable precipitation event and every instance of snow melt, water flows onto and over exposed materials and accumulated pollutants at the Facility, generating stormwater runoff.

61.    Defendants have discharged and continue to discharge stormwater associated with industrial activities.

62.    Upon information and belief, the Facility spills manufacturing waste and products that enter the retention basin, which is discharged—untreated—to Reedy Meadow Brook.

63.    Upon information and belief, the Facility is exposed to precipitation or stormwater, requiring the Facility to implement and maintain a Stormwater Pollution Prevention Plan ("SWPPP"). Permit § I.C at 9.

The Wastewater Treatment Plant

64.    The Facility's wastewater treatment plant contains an equalization tank into which wastewater and some stormwater flow, which controls the flow rate of the waters.

65.    Wastewater and some stormwater are treated at the wastewater treatment plant. Wastewater stored at the tank farm drains into the wastewater treatment plant. Stormwater catch basins near the tank farm drain into the wastewater treatment plant.

66.    The wastewater and stormwater then flow into an anaerobic digester where bacteria break down organic matter.

67.    From the anaerobic digester, the wastewater flows into uncovered batch reactors for aeration.

68.    After aeration, the wastewater is decanted (the transfer of liquid without settled solids) to a covered clarifier.

69.    From the clarifier, the wastewater drains to sand filters where polymers are added, which are substances that react with solids suspended in water to form clumps.

70.    The Facility then discharges the effluent into a final aeration basin, through a UV light disinfecting unit, to Reedy Meadow Brook.

**The Facility's NPDES Permit**

71.    On December 7, 2016, the Facility became subject to NPDES Permit No. MA 0004936 for its wastewater and stormwater discharges.[2]

---

[2] TRANSFER OF OWNERSHIP, NPDES PERMIT (No. MA0004936), https://www3.epa.gov/region1/npdes/permits/2016/finalma0004936transferofownership.pdf.

72.     Pursuant to 40 C.F.R. § 122.6, the Permit has been administratively continued and remains fully effective.

**The Facility's Monitoring and Reporting Requirements Under the Permit**

73.     Defendants are required to submit discharge monitoring reports ("DMRs") to EPA and MassDEP by the 15th day of each month. Permit § I.F at 13. The DMRs are required to summarize the monitoring results obtained during each calendar month, including effluent limitation exceedances.

74.     Defendants must also report the amount of off-site beverage wastewater the Facility receives and uses in its wastewater treatment plant. *Id.* §§ I.A.1 n.1, I.A.D at 4, 12.

**The Facility's Numerical Effluent Limitations for Wastewater Discharges Under the Permit**

75.     The Permit places limits on the quantity and concentration of pollutants that the Facility is legally permitted to discharge into Reedy Meadow Brook and Mill Pond from Outfall 001 by setting wastewater effluent limitations for phosphorus, total suspended solids, pH, biochemical oxygen demand, temperature, and aluminum. *Id.* § I.A.1 at 2.

76.     The Permit requires that the phosphorus effluent discharged from the Facility not exceed a daily maximum of 1.25 pounds per day (lbs/day). *Id.* During April 1–October 31, the Permit requires that the phosphorus effluent discharged from the Facility not exceed a monthly average of 0.23 lbs/day. *Id.* During November 1–March 31, the Permit requires that the phosphorus effluent discharged from the Facility not exceed a monthly average of 0.46 lbs/day. *Id.* This limit is expressed as a sixty-day rolling average limit. *Id.* § I.A.1 n.6 at 5.

77.     The Permit requires that the total suspended solids effluent discharged from the Facility not exceed a daily maximum of 20 milligrams per liter (mg/L) and not exceed a monthly average of 10 mg/L. *Id.* § I.A.1 at 2.

78.    The Permit requires that the pH effluent discharged from the Facility not fall below or exceed the range of 6.5–8.3 standard units (s.u.). *Id.*

79.    The Permit requires that the biochemical oxygen demand effluent discharged from the Facility not exceed a daily maximum of 20 mg/L and not exceed a monthly average of 10 mg/L. *Id.*

80.    The Permit requires that the effluent discharged from the Facility not exceed a daily maximum temperature of 83 degrees Fahrenheit (°F). *Id.*

81.    The Permit requires that the aluminum effluent discharged from the Facility not exceed a monthly average of 0.1 mg/L. *Id.*

**The Facility's Numerical Effluent Limitations for Stormwater Discharges Under the Permit**

82.    The Facility discharges stormwater associated with industrial activity. *Id.* § I.C at 9–12.

83.    The Facility's industrial activities include the manufacture and bottling of Pepsi beverages.

84.    The Permit places limits on the quantity and concentration of pollutants that the Facility is legally permitted to discharge into Reedy Meadow Brook and Mill Pond from Outfall 002 by setting stormwater effluent limitations for total suspended solids. *Id.* § I.A.2 at 7.

85.    The Permit requires that the total suspended solids effluent discharged from the Facility not exceed a maximum daily of 100 mg/L. *Id.*

**The Facility's State Surface Water Quality Standards Requirements Under the Permit**

86.    The Permit requires that "discharge shall not cause a violation of the water quality standards of the receiving waters." *Id.* §§ I.A.1–2 at 3, 7.

11

87.     Massachusetts' state surface water quality standards require that for all surface waters, "existing uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 314 CMR 4.04(1).

88.     Massachusetts' Class B waters, including Reedy Meadow Brook and Mill Pond, are "designated as a habitat for fish, other aquatic life, and wildlife, including for their reproduction, migration, growth and other critical functions, and for primary and secondary contact recreation." *Id.* 4.05(3)(b).

89.     Primary contact recreation means "[a]ny recreation or other water use in which there is prolonged and intimate contact with the water," including wading, swimming, diving, surfing, and water skiing. *Id.* 4.02.

90.     Secondary contact recreation means "[a]ny recreation or other water use in which contact with the water is either incidental or accidental," including fishing, human consumption of fish, and boating. *Id.*

91.     Massachusetts' state surface water quality standards require that all surface waters shall:

a.      "[B]e free from pollutants in concentrations or combinations that settle to form objectionable deposits; float as debris, scum or other matter to form nuisances; produce objectionable odor, color, taste or turbidity; or produce undesirable or nuisance species of aquatic life." *Id.* 4.05(5)(a);

b.      "[B]e free from pollutants in concentrations or combinations or from alterations that adversely affect the physical or chemical nature of the bottom, interfere with the propagation of fish or shellfish, or adversely affect populations of non-mobile or sessile benthic organisms." *Id.* 4.05(5)(b);

12

c.  "[B]e free from nutrients in concentrations that would cause or contribute to impairment of existing or designated uses," unless naturally occurring. *Id.* 4.05(5)(c); and

d.  "[B]e free from pollutants in concentrations or combinations that are toxic to humans, aquatic life or wildlife." *Id.* 4.05(5)(e).

92.  Massachusetts' state surface water quality standards require that Class B waters, including Reedy Meadow Brook and Mill Pond, shall:

a.  "[N]ot be less than 6.0 mg/L [of dissolved oxygen] in cold water fisheries and not less than 5.0 mg/L in warm water fisheries." *Id.* 4.05(3)(b)(1);

b.  "Not exceed [a temperature of] 83ºF (23.8ºC) in warm water fisheries." *Id.* 4.05(3)(b)(2);

c.  "[B]e in the [pH] range of 6.5 through 8.3 standard units and not more than 0.5 units outside of the natural background range." *Id.* 4.05(3)(b)(3);

d.  "[B]e free from floating, suspended and settleable solids in concentrations and combinations that would impair any use assigned to this Class, that would cause aesthetically objectionable conditions, or that would impair the benthic biota or degrade the chemical composition of the bottom." *Id.* 4.05(3)(b)(5);

e.  "[B]e free from color and turbidity in concentrations or combinations that are aesthetically objectionable or would impair any use assigned to this Class." *Id.* 4.05(3)(b)(6); and

f.  "[B]e free from oil, grease and petrochemicals that produce a visible film on the surface of the water, impart an oily taste to the water or an oily or other undesirable taste to the edible portions of aquatic life, coat the banks or bottom of

13

the water course, or are deleterious or become toxic to aquatic life." *Id.* 4.05(3)(b)(7).

**The Facility's Narrative Limitations Under the Permit**

93.    The Permit requires that the Facility's discharges "shall not cause objectionable discoloration of the receiving waters." Permit §§ I.A.1–2 at 3, 7.

94.    The Permit requires that the Facility's effluent "shall contain neither a visible oil sheen, foam, nor floating solids at any time." *Id.*

95.    The Permit requires that the Facility "shall not discharge any pollutant or combination of pollutants in toxic amounts." *Id.* § I.A.3 at 8.

96.    The Permit requires that the toxic components of the Facility's effluent "shall not result in any demonstrable harm to aquatic life or violate any state or federal water quality standard which has been or may be promulgated." *Id.*

**The Facility's Best Management Practices and Stormwater Control Measures Requirements Under the Permit**

97.    The Permit requires Defendants to "implement and maintain a Stormwater Pollution Prevention Plan (SWPPP) designed to reduce, or prevent, the discharge of pollutants in stormwater to the receiving waters identified in this permit." *Id.* § I.C.1 at 9.

98.    The Permit requires that the SWPPP be consistent with permit requirements and "shall serve as a tool to document the permittee's compliance with the terms of this permit." *Id.*

99.    The Permit requires that the SWPPP shall document the selection, design, and installation of control measures, and shall contain: a pollution prevention team; a site description; a summary of all pollutant sources; a description of all stormwater controls; and a schedule and procedure for implementation and maintenance of control measures, quarterly inspections, and best management practices ("BMPs"). *Id.* § I.C.3 at 10.

14

100.    The Permit requires Defendants to prepare the SWPPP "in accordance with good engineering practices and shall be consistent with the general provisions for SWPPPs included in the most recent version of the MSGP [Multi-Sector General Permit]." *Id.*[3]

101.    The Permit requires the SWPP to implement BMPs to "minimize the discharge of pollutants in stormwater." *Id.* § I.C.4 at 10. The BMPs must also be "consistent with the control measures described in the most recent version of the MSGP." *Id.*

102.    The Permit imposes non-numeric effluent limitations, which the Facility must satisfy through BMPs, including:

  a.    "Minimizing exposure of manufacturing, processing, and material storage areas to stormwater discharges." *Id.*;

  b.    Providing "[g]ood housekeeping measures designed to maintain areas that are potential sources of pollutants." *Id.*;

  c.    Implementing "[p]reventative maintenance programs" and "[s]pill prevention and response procedures" to "avoid leaks, spills and other releases of pollutants in stormwater discharged to receiving waters" and "ensure effective responses to spills and leaks if or when they occur." *Id.* § I.C.4 at 11; and

  d.    Implementing "[r]unoff management practices to divert, infiltrate, reuse, contain, or otherwise reduce stormwater runoff." *Id.*

103.    The Permit requires Defendants to take corrective action after a violation of a numerical or non-numerical stormwater effluent limitation and document such corrective action in the SWPPP. *Id.* § I.C.7 at 12.

---

[3] The most recent version of the MSGP is the 2021 version. EPA, NPDES MGSP FOR STORMWATER DISCHARGES ASSOCIATED WITH INDUSTRIAL ACTIVITY (2021), https://www.epa.gov/sites/default/files/2021-01/documents/2021_msgp_-_permit_parts_1-7.pdf [hereinafter "MSGP Permit"].

**Waterbodies Affected by the Facility's Wastewater and Stormwater Discharges**

104.    The Facility is located on Harvard Road, 200 feet from Reedy Meadow Brook.

105.    The Facility is located 0.7 miles from Mill Pond, into which Reedy Meadow Brook drains.

Reedy Meadow Brook

106.    Reedy Meadow Brook is a Class B waterbody under 314 CMR 4.05(3)(b). Permit at 53, Fact Sheet at 6.

107.    Reedy Meadow Brook is part of the Merrimack River watershed and is a navigable water within the meaning of the CWA. 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2(a).

108.    Reedy Meadow Brook is designated for primary and secondary contact recreation, including swimming, diving, surfing, water skiing, fishing, human consumption of fish, and boating.

109.    Reedy Meadow Brook is a warm water fishery and designated habitat for fish, other aquatic life, and wildlife.

110.    Reedy Meadow Brook is impaired because it cannot be used for its designated uses: fish, other aquatic life, and wildlife habitat; primary contact recreation; and secondary contact recreation.

Mill Pond

111.    Mill Pond is a Class B waterbody under 314 CMR 4.05(3)(b). *See* Permit at 53, Fact Sheet at 6.

112.    Mill Pond is part of the Merrimack River watershed and is a navigable water within the meaning of the CWA. 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2(a).

113.    Mill Pond is designated for primary and secondary contact recreation, including swimming, diving, surfing, water skiing, fishing, human consumption of fish, and boating.

114.    Mill Pond is a warm water fishery and designated habitat for fish, other aquatic life, and wildlife.

115.    Mill Pond is impaired because it cannot be used for its designated uses: primary contact recreation; secondary contact recreation; and consistently good aesthetic value.

**Communities Affected by the Facility's Water Pollutants**

116.    According to the 2020 Census, 10,141 individuals, including CLF members, live in the town of Littleton.

117.    Littleton High School is located 0.4 miles from the Facility.

118.    Koerper Field is located 0.4 miles from the Facility.

119.    The Blessed Trinity Parish – St. Anne Church is located 0.5 miles from the Facility.

120.    Veterans of Foreign Wars Littleton Post 6556 is located 0.2 miles from the Facility.

121.    Life Care Center of Nashoba Valley is located one mile from the Facility.

122.    Oak Hill Reservation and Lookout Rock Trailhead are located less than 500 feet from the Facility.

123.    Mill Hill Conservation Area is located one mile from the Facility.

**The Facility's Violations of the Clean Water Act**

<u>Violations of the Permit's Effluent Limitations for Phosphorus</u>

124.    Since April 2019, Defendants have discharged and continue to discharge effluent in violation of the Permit's daily maximum of 1.25 lbs/day at least twenty-five times and the Permit's monthly average of 0.23 or 0.46 lbs/day at least twenty-three times, as detailed in the tables below.

17

*Table 1. Phosphorus Daily Maximum Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 125. | 11/30/2021 | 001 | 1.25 lbs/d | 1.34 lbs/d | Daily Maximum | 7% |
| 126. | 12/31/2021 | 001 | 1.25 lbs/d | 1.7 lbs/d | Daily Maximum | 36% |
| 127. | 3/31/2022 | 001 | 1.25 lbs/d | 2.03 lbs/d | Daily Maximum | 62% |
| 128. | 4/30/2022 | 001 | 1.25 lbs/d | 2.41 lbs/d | Daily Maximum | 93% |
| 129. | 5/31/2022 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 130. | 5/31/2022 | 001 | 1.25 lbs/d | 2.04 lbs/d | Daily Maximum | 63% |
| 131. | 12/31/2022 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 132. | 12/31/2022 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 133. | 12/31/2022 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 134. | 2/28/2023 | 001 | 1.25 lbs/d | 3.93 lbs/d | Daily Maximum | 214% |
| 135. | 3/31/2023 | 001 | 1.25 lbs/d | 1.85 lbs/d | Daily Maximum | 48% |
| 136. | 4/30/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 137. | 4/30/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 138. | 4/30/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 139. | 5/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 140. | 5/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 141. | 5/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 142. | 6/30/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 143. | 8/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 144. | 9/30/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 145. | 10/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 146. | 10/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 147. | 10/31/2023 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 148. | 1/31/2024 | 001 | 1.25 lbs/d | 3.74 lbs/d | Daily Maximum | 199% |
| 149. | 3/31/2024 | 001 | 1.25 lbs/d | 1.67 lbs/d | Daily Maximum | 34% |

*Table 2. Phosphorus Monthly Average Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 150. | 11/30/2021 | 001 | 0.46 lbs/d | 0.55 lbs/d | Monthly Average | 20% |
| 151. | 12/31/2021 | 001 | 0.46 lbs/d | 0.75 lbs/d | Monthly Average | 63% |
| 152. | 3/31/2022 | 001 | 0.46 lbs/d | 0.98 lbs/d | Monthly Average | 113% |
| 153. | 4/30/2022 | 001 | 0.23 lbs/d | 0.44 lbs/d | Monthly Average | 91% |
| 154. | 5/31/2022 | 001 | 0.23 lbs/d | 0.96 lbs/d | Monthly Average | 317% |
| 155. | 5/31/2022 | 001 | 0.23 lbs/d | 0.5 lbs/d | Monthly Average (rolling average) | 117% |
| 156. | 6/30/2022 | 001 | 0.23 lbs/d | 0.3 lbs/d | Monthly Average | 30% |
| 157. | 8/31/2022 | 001 | 0.23 lbs/d | 0.56 lbs/d | Monthly Average | 143% |
| 158. | 10/31/2022 | 001 | 0.23 lbs/d | 0.53 lbs/d | Monthly Average | 130% |
| 159. | 11/30/2022 | 001 | 0.46 lbs/d | 0.53 lbs/d | Monthly Average | 15% |
| 160. | 12/31/2022 | 001 | 0.46 lbs/d | 0.69 lbs/d | Monthly Average | 50% |

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 161. | 1/31/2023 | 001 | 0.46 lbs/d | 0.54 lbs/d | Monthly Average | 17% |
| 162. | 2/28/2023 | 001 | 0.46 lbs/d | 1.93 lbs/d | Monthly Average | 320% |
| 163. | 3/31/2023 | 001 | 0.46 lbs/d | 1.23 lbs/d | Monthly Average | 167% |
| 164. | 4/30/2023 | 001 | 0.23 lbs/d | 0.43 lbs/d | Monthly Average | 87% |
| 165. | 5/31/2023 | 001 | 0.23 lbs/d | 0.73 lbs/d | Monthly Average | 217% |
| 166. | 6/30/2023 | 001 | 0.23 lbs/d | 0.69 lbs/d | Monthly Average | 200% |
| 167. | 7/31/2023 | 001 | 0.23 lbs/d | 0.67 lbs/d | Monthly Average | 191% |
| 168. | 8/31/2023 | 001 | 0.23 lbs/d | 0.62 lbs/d | Monthly Average | 170% |
| 169. | 9/30/2023 | 001 | 0.23 lbs/d | 0.62 lbs/d | Monthly Average | 170% |
| 170. | 10/31/2023 | 001 | 0.23 lbs/d | 0.62 lbs/d | Monthly Average | 170% |
| 171. | 1/31/2024 | 001 | 0.46 lbs/d | 2.31 lbs/d | Monthly Average | 402% |
| 172. | 3/31/2024 | 001 | 0.46 lbs/d | 0.57 lbs/d | Monthly Average | 24% |

Violations of the Permit's Effluent Limitations for Total Suspended Solids

173.    Since April 2019, Defendants have discharged and continue to discharge effluent in violation of the Permit's 1) daily maximum of 20 mg/L at least four times and the Permit's monthly average of 10 mg/L at least five times from Outfall 001; and 2) daily maximum of 100 mg/L at least four times from Outfall 002, as detailed in the tables below.

*Table 3. Total Suspended Solids Daily Maximum Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 174. | 4/30/2019 | 002 | 100 mg/L | 212.7 mg/L | Daily Maximum | 113% |

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 175. | 11/30/2019 | 001 | 20 mg/L | 35 mg/L | Daily Maximum | 75% |
| 176. | 1/31/2020 | 002 | 100 mg/L | 139.6 mg/L | Daily Maximum | 40% |
| 177. | 3/31/2020 | 002 | 100 mg/L | 110.2 mg/L | Daily Maximum | 10% |
| 178. | 6/30/2020 | 002 | 100 mg/L | 131.8 mg/L | Daily Maximum | 32% |
| 179. | 12/31/2022 | 001 | Unknown | Unknown | Daily Maximum | Unknown |
| 180. | 12/31/2022 | 001 | 20 mg/L | 36 mg/L | Daily Maximum | 80% |
| 181. | 5/31/2023 | 001 | 20 mg/L | 29 mg/L | Daily Maximum | 45% |

*Table 4. Total Suspended Solids Monthly Average Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 182. | 11/30/2019 | 001 | 10 mg/L | 15 mg/L | Monthly Average | 50% |
| 183. | 12/31/2022 | 001 | 10 mg/L | 19 mg/L | Monthly Average | 90% |
| 184. | 2/28/2023 | 001 | 10 mg/L | 13 mg/L | Monthly Average | 30% |
| 185. | 3/31/2023 | 001 | 10 mg/L | 11 mg/L | Monthly Average | 10% |
| 186. | 5/31/2023 | 001 | 10 mg/L | 14 mg/L | Monthly Average | 40% |

Violations of the Permit's Effluent Limitation for pH

187.    Since April 2019, Defendants have discharged and continue to discharge effluent in excess of the Permit's daily maximum of 8.3 s.u. at least eighteen times, as detailed in the table below.

21

*Table 5. pH Limit Daily Maximum Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 188. | 9/30/2019 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 189. | 9/30/2019 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 190. | 12/31/2019 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 191. | 2/29/2020 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 192. | 4/30/2020 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 193. | 4/30/2020 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 194. | 5/31/2020 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 195. | 5/31/2020 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 196. | 5/31/2020 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 197. | 6/30/2020 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 198. | 7/31/2020 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 199. | 9/30/2021 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 200. | 9/30/2021 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 201. | 9/30/2021 | 001 | 8.3 s.u. | 8.5 s.u. | Daily Maximum | 2% |
| 202. | 9/30/2021 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 203. | 9/30/2021 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 204. | 9/30/2021 | 001 | 8.3 s.u. | 8.4 s.u. | Daily Maximum | 1% |
| 205. | 11/30/2021 | 001 | 8.3 s.u. | 8.6 s.u. | Daily Maximum | 4% |

Violations of the Permit's Effluent Limitations for Biochemical Oxygen Demand

206.    Since April 2019, Defendants have discharged and continue to discharge effluent in violation of the Permit's daily maximum of 20 mg/L at least four times and the Permit's monthly average of 10 mg/L at least three times, as detailed in the tables below.

*Table 6. Biochemical Oxygen Demand Daily Maximum Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 207. | 6/30/2019 | 001 | 20 mg/L | 24 mg/L | Daily Maximum | 20% |
| 208. | 3/31/2021 | 001 | 20 mg/L | 66 mg/L | Daily Maximum | 230% |
| 209. | 12/31/2022 | 001 | 20 mg/L | 194 mg/L | Daily Maximum | 870% |
| 210. | 3/31/2024 | 001 | 20 mg/L | 56 mg/L | Daily Maximum | 180% |

*Table 7. Biochemical Oxygen Demand Monthly Average Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 211. | 3/31/2021 | 001 | 10 mg/L | 20 mg/L | Monthly Average | 100% |
| 212. | 12/31/2022 | 001 | 10 mg/L | 103 mg/L | Monthly Average | 930% |
| 213. | 3/31/2024 | 001 | 10 mg/L | 14 mg/L | Monthly Average | 40% |

Violations of the Permit's Effluent Limitation for Temperature

214.    Since April 2019, Defendants have discharged and continue to discharge effluent in violation of the Permit's daily maximum temperature of 83°F at least four times, as detailed in the table below.

23

*Table 8. Temperature Daily Maximum Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 215. | 7/31/2020 | 001 | 83°F | 84°F | Daily Maximum | 1% |
| 216. | 7/31/2020 | 001 | 83°F | 84°F | Daily Maximum | 1% |
| 217. | 6/30/2023 | 001 | 83°F | 85°F | Daily Maximum | 2% |
| 218. | 6/30/2023 | 001 | 83°F | Unknown | Daily Maximum | Unknown |

Violations of the Permit's Effluent Limitation for Aluminum

219. Since April 2019, Defendants have discharged and continue to discharge effluent in violation of the Permit's monthly average of 0.1 mg/L at least three times, as detailed in the table below.

*Table 9. Aluminum Monthly Average Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Permit Allowance | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 220. | 2/28/2023 | 001 | 0.1 mg/L | 0.108 mg/L | Monthly Average | 8% |
| 221. | 4/30/2023 | 001 | 0.1 mg/L | 0.134 mg/L | Monthly Average | 34% |
| 222. | 10/31/2023 | 001 | 0.1 mg/L | 0.11 mg/L | Monthly Average | 10% |

Violations of the Prohibition Against Violating State Surface Water Quality Standards

223. On numerous occasions since April 2019, Defendants have discharged and continue to discharge pollutants (including but not limited to phosphorus, total suspended solids, excess pH, biochemical oxygen demand, thermal pollution, and aluminum) that, *inter alia*, 1) impair the use(s) of the Reedy Meadow Brook or Mill Pond; 2) are aesthetically objectionable; 3) harm

aquatic life; 4) adversely affect the physical or chemical nature of the bottom of Reedy Meadow Brook or Mill Pond; and/or 5) are toxic to humans, aquatic life, or wildlife.

224.   The discharge of such pollutants causes or contributes to violations of Massachusetts' surface water quality standards referenced in paragraphs 86–92 above, in violation of the Facility's Permit.

Violations of Narrative Effluent Limitations

225.   On numerous occasions since April 2019, Defendants have discharged and continue to discharge pollutants (including but not limited to phosphorus, total suspended solids, excess pH, biochemical oxygen demand, thermal pollution, and aluminum) that, *inter alia*, 1) cause objectionable discoloration; 2) contain oil sheen, foam, or floating solids; 3) impair designated uses of Reedy Meadow Brook or Mill Pond; and/or 4) are hazardous or toxic to human health and aquatic life.

226.   The discharge of such pollutants violates the narrative effluent limitations referenced in paragraphs 93–96 above, in violation of the Facility's Permit.

Violations of the Requirement to Minimize the Discharge of Pollutants in Stormwater

227.   Since April 2019, on numerous occasions, Defendants have failed and continue to fail to identify and implement best management practices ("BMPs") that minimize the discharge of pollutants in stormwater referenced in paragraphs 97–103 above by 1) causing industrial materials to be exposed to precipitation; and 2) exceeding the MSGP numerical stormwater effluent limitations, in violation of the Permit.

228.   Defendants leave uncovered manufacturing waste, tea, teabags, tea grounds, and waste oil outside, which enter or are carried by stormwater—untreated—into Reedy Meadow Brook and Mill Pond.

25

229.    Defendants have exceeded and continue to exceed numerical stormwater effluent limitations referenced in Table 3, paragraphs 174–181 above, and the MSGP benchmark threshold for phosphorus,[4] as detailed in the table below.

*Table 10. MSGP Phosphorus Benchmark Exceedances*

| Paragraph # | Monitoring Period End Date | Outfall | Benchmark Threshold | Measured Value | Type of Limit | Percent Exceedance |
|---|---|---|---|---|---|---|
| 230. | 2/29/2020 | 002 | 2 mg/L | 8.51 mg/L | Daily Maximum | 326% |
| 231. | 8/31/2021 | 002 | 2 mg/L | 10 mg/L | Daily Maximum | 400% |
| 232. | 9/30/2023 | 002 | 2 mg/L | 3.7 mg/L | Daily Maximum | 85% |

Violations of the Requirement to Take and Document Corrective Action After Violations of Stormwater Effluent Limitations

233.    Since April 2019, on numerous occasions, Defendants have failed and continue to fail to take and document corrective action after stormwater effluent limitations, in violation of the Permit.

234.    Defendants have violated and continue to violate stormwater effluent limitations referenced in Table 3, paragraphs 174–181; paragraphs 227–229; and Table 10, paragraphs 230–232 above.

235.    Upon information and belief, Defendants have neither taken nor documented corrective action after such stormwater effluent limitations, in violation of the Permit.

---

[4] MSGP Permit, *supra* note 3, at 38 (setting 2.0 mg/L as the benchmark threshold for phosphorus).

Violations of Monitoring and Reporting Requirements

236. Since April 2019, Defendants have failed and continue to fail to comply with their

monitoring and reporting requirements at least thirty-seven times, in violation of the Permit, as

detailed in the table below.

*Table 11. Monitoring and Reporting Failures*

| Paragraph # | Monitoring Period End Date | Monitoring and Reporting Requirement |
|---|---|---|
| 237. | 10/31/2019 | Monthly Off-site Wastewater Amount |
| 238. | 3/31/2020 | Daily Maximum, Total Suspended Solids |
| 239. | 3/31/2020 | Monthly Average, Total Suspended Solids |
| 240. | 5/31/2021 | Monthly Off-site Wastewater Amount |
| 241. | 9/30/2021 | Daily Maximum, Aluminum |
| 242. | 9/30/2021 | Monthly Average, Aluminum |
| 243. | 9/30/2021 | Daily Maximum, Chlorine |
| 244. | 9/30/2021 | Monthly Average, Chlorine |
| 245. | 9/30/2021 | Daily Maximum, *E. Coli* |
| 246. | 9/30/2021 | Monthly Average, *E. Coli* |
| 247. | 9/30/2021 | Daily Maximum (lbs/day), Ammonia Nitrogen |
| 248. | 9/30/2021 | Monthly Average (lbs/day), Ammonia Nitrogen |
| 249. | 9/30/2021 | Daily Maximum (mg/L), Ammonia Nitrogen |
| 250. | 9/30/2021 | Monthly Average (mg/L), Ammonia Nitrogen |
| 251. | 9/30/2021 | Daily Maximum, pH |
| 252. | 9/30/2021 | Daily Maximum, Fecal *Streptococci* |
| 253. | 9/30/2021 | Monthly Average, Fecal *Streptococci* |

| Paragraph # | Monitoring Period End Date | Monitoring and Reporting Requirement |
|---|---|---|
| 254. | 9/30/2021 | Daily Maximum, Total Suspended Solids |
| 255. | 9/30/2021 | Monthly Average, Total Suspended Solids |
| 256. | 6/30/2022 | Monthly Off-site Wastewater Amount |
| 257. | 7/31/2022 | Monthly Off-site Wastewater Amount |
| 258. | 8/31/2022 | Monthly Off-site Wastewater Amount |
| 259. | 9/30/2022 | Monthly Off-site Wastewater Amount |
| 260. | 10/31/2022 | Monthly Off-site Wastewater Amount |
| 261. | 11/30/2022 | Monthly Off-site Wastewater Amount |
| 262. | 3/31/2023 | Monthly Off-site Wastewater Amount |
| 263. | 5/31/2023 | Monthly Off-site Wastewater Amount |
| 264. | 6/30/2023 | Monthly Off-site Wastewater Amount |
| 265. | 7/31/2023 | Monthly Off-site Wastewater Amount |
| 266. | 8/31/2023 | Monthly Off-site Wastewater Amount |
| 267. | 9/30/2023 | Monthly Off-site Wastewater Amount |
| 268. | 10/31/2023 | Monthly Off-site Wastewater Amount |
| 269. | 11/30/2023 | Monthly Off-site Wastewater Amount |
| 270. | 12/31/2023 | Monthly Off-site Wastewater Amount |
| 271. | 1/31/2024 | Monthly Off-site Wastewater Amount |
| 272. | 2/29/2024 | Monthly Off-site Wastewater Amount |
| 273. | 4/30/2024 | Monthly Off-site Wastewater Amount |

**The Harms of the Facility's Discharges**

274.    Excess phosphorus contributes to aquatic plants and cyanobacteria overgrowth, which decreases dissolved oxygen levels in waterways (called "eutrophication"). Fish and other aquatic animals struggle to survive in low oxygen conditions, leading to fish die-offs.

275.    Human exposure to cyanotoxins from cyanobacteria can lead to abdominal pain, headache, sore throat, vomiting and nausea, numbness, drowsiness, incoherent speech, salivation, neurodegenerative diseases (like amyotrophic lateral sclerosis ("ALS"), and respiratory paralysis leading to death.

276.    Total suspended solids are organic and inorganic particles. Total suspended solids obstruct sunlight from penetrating water and impair aesthetic value of waterbodies. Solids that settle out as bottom deposits can alter or destroy habitat for aquatic life.

277.    The pH value of waterbodies is a critical indicator of water quality. High pH (basic) makes certain chemicals like ammonia toxic to aquatic life and cause the water to have an unpleasant smell and taste. For aquatic life, pH pollution can result in increased mortality, decreased reproductive success, and stresses on community structure and ecosystem function.

278.    Biochemical Oxygen Demand ("BOD") measures the amount of oxygen consumed by microorganisms breaking down organic matter in effluent as well as the chemical oxidation of inorganic matter. The greater the BOD, the more rapidly oxygen is depleted in a waterbody and the less oxygen is available to aquatic life for essential functions. Elevated BOD can overly stress, suffocate, and kill aquatic life.

279.    Fish, insects, and other aquatic species all have specific temperature ranges necessary for their survival and can die when temperature shifts outside a species' required range. Heated water increases the metabolic rate of aquatic life, making them consume more food in a shorter

time and increasing competition for resources. Higher water temperatures also increase plant growth rates, and lead to overpopulation and algal blooms.

280.    Heavy metals like aluminum are toxic, and human exposure to aluminum in drinking water can cause serious health issues to vital organs such as neurological, central nervous, and respiratory systems. Elevated levels of aluminum can also impair aquatic species' ability to regulate nutrients and impair respiratory functions by accumulating on gills.

**The Facility's Harms to CLF Members**

281.    CLF members use Reedy Meadow Brook and Mill Pond for aesthetic and recreational enjoyment and observing wildlife.

282.    CLF members cherish Reedy Meadow Brook and Mill Pond as places of natural importance, historical interest, and personal significance.

283.    CLF members use Reedy Meadow Brook and Mill Pond to kayak, canoe, fish, walk, irrigate, and observe wildlife.

284.    CLF members own real property abutting Mill Pond.

285.    The Facility's discharges of pollutants into Reedy Meadow Brook and Mill Pond have degraded the health of the waterbodies and contributed to their impairments in a way that diminishes the use and enjoyment of the waterbodies by CLF members.

286.    CLF members are concerned about the health impacts of pollution from direct contact with waterbodies downstream from the Facility.

287.    CLF members worry about the potential health effects of being exposed to cyanobacteria from excess phosphorus, heavy metals, and other pollutants in Reedy Meadow Brook and Mill Pond.

288.    CLF members worry about the negative impact of excess phosphorus, heavy metals, and other pollutants on their ability to enjoy observing wildlife in Reedy Meadow Brook and Mill Pond.

289.    The presence of odor, unnatural color, scum, foam, and diminished water clarity adversely affect the aesthetic enjoyment of Reedy Meadow Brook and Mill Pond by CLF members.

290.    The Facility's contribution to water pollution in Mill Pond degrades CLF members' use and enjoyment of their properties near Mill Pond.

291.    The actual and threatened harm to CLF's members would be redressed by a declaration, injunction, civil penalties, and other relief that prevents or deters future violations of the Facility's Permit, and that requires Defendants to offset their pollution from these violations by reducing its pollution, or otherwise remediating harm that has already been caused to CLF members and their local communities.

## CLAIMS FOR RELIEF

**Count I: Violations of Phosphorus Effluent Limitations Under the Clean Water Act**

292.    Each paragraph above is incorporated by reference as if fully set forth herein.

293.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitations for phosphorus at least forty-eight times referenced in Tables 1 and 2, paragraphs 125–172 above, in violation of Section I.A.1 of the Permit.

294.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

295.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for phosphorus is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## Count II: Violations of Total Suspended Solids Effluent Limitations Under the Clean Water Act

296.    Each paragraph above is incorporated by reference as if fully set forth herein.

297.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitations for total suspended solids at least thirteen times referenced in Tables 3 and 4, paragraphs 174–186 above, in violation of Sections I.A.1–2 of the Permit.

298.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

299.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for total suspended solids is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## Count III: Violations of the pH Effluent Limitation Under the Clean Water Act

300.    Each paragraph above is incorporated by reference as if fully set forth herein.

301.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitations for pH at least eighteen times referenced in Table 5, paragraphs 188–205 above, in violation of Section I.A.1 of the Permit.

302.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

303.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for pH is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### Count IV: Violations of Biochemical Oxygen Demand Effluent Limitations Under the Clean Water Act

304.    Each paragraph above is incorporated by reference as if fully set forth herein.

305.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitations for biochemical oxygen demand at least seven times referenced in Tables 6 and 7, paragraphs 207–213 above, in violation of Section I.A.1 of the Permit.

306.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

307.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for biochemical oxygen demand is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### Count V: Violations of the Temperature Effluent Limitation under the Clean Water Act

308.    Each paragraph above is incorporated by reference as if fully set forth herein.

309.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitation for temperature at least four times referenced in Table 8, paragraphs 215–218 above, in violation of Section I.A.1 of the Permit.

310.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

311.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for temperature is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### Count VI: Violations of the Aluminum Effluent Limitation Under the Clean Water Act

312.    Each paragraph above is incorporated by reference as if fully set forth herein.

313.    Since April 2019, Defendants have discharged effluent in violation of the Permit's effluent limitation for aluminum at least three times referenced in Table 9, paragraphs 220–222 above, in violation of Section I.A.1 of the Permit.

314.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

315.    Each day that Defendants have violated or continue to violate the Permit's effluent limitation for aluminum is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### Count VII: Violations of the Prohibition Against Violating State Surface Water Quality Standards Under the Clean Water Act

316.    Each paragraph above is incorporated by reference as if fully set forth herein.

317.    On numerous occasions since April 2019, Defendants have discharged and continue to discharge pollutants (including but not limited to phosphorus, total suspended solids, excess pH, biochemical oxygen demand, thermal pollution, and aluminum) that, *inter alia*, 1) impair any use of the Reedy Meadow Brook or Mill Pond; 2) are aesthetically objectionable; 3) harm aquatic life; 4) adversely affect the physical or chemical nature of the bottom of Reedy Meadow Brook or Mill Pond; and/or 5) are toxic to humans, aquatic life, or wildlife, referenced in paragraphs 223–224 above, in violation of Sections I.A.1–2 of the Permit.

318.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

319.    Each day that Defendants have violated or continue to violate the Permit's prohibition against violating Massachusetts' surface water quality standards is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Count VIII: Violations of Narrative Effluent Limitations Under the Clean Water Act**

320.    Each paragraph above is incorporated by reference as if fully set forth herein.

321.    On numerous occasions since April 2019, Defendants has discharged and continue to discharge pollutants (including but not limited to phosphorus, total suspended solids, excess pH, biochemical oxygen demand, thermal pollution, and aluminum) that, *inter alia*, 1) cause objectionable discoloration; 2) contain oil sheen, foam, or floating solids; 3) impair designated uses of Reedy Meadow Brook or Mill Pond; and/or 4) are hazardous or toxic to human health and aquatic life, referenced in paragraphs 225–226 above, in violation of Sections I.A.1–3 of the Permit.

322.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

323.    Each day that Defendants have violated or continue to violate the Permit's narrative effluent limitations is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Count IX: Violations of the Requirement to Minimize the Discharge of Pollutants in Stormwater Under the Clean Water Act**

324.    Each paragraph above is incorporated by reference as if fully set forth herein.

35

325. On numerous occasions since April 2019, Defendants have failed and continue to fail to identify and implement best management practices ("BMPs") that minimize the discharge of pollutants in stormwater referenced in Tables 3 and 10, paragraphs 174–181 and 230–232, respectfully, and paragraphs 227–229 above, in violation of Section I.C.4 of the Permit.

326. In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

327. Each day that Defendants have violated or continue to violate the Permit's requirement to minimize the discharge of pollutants in stormwater is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Count X: Violations of the Requirements to Take and Document Corrective Action After Violations of Stormwater Effluent Limitations Under the Clean Water Act**

328. Each paragraph above is incorporated by reference as if fully set forth herein.

329. On numerous occasions since April 2019, Defendants have failed and continue to fail to take and document corrective action after violating stormwater effluent limitations referenced in Tables 3 and 10, paragraphs 174–181 and 230–232, respectfully, and paragraphs 227–229 above, in violation of Section I.C.7 of the Permit.

330. In light of the Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

331. Each day that Defendants have violated or continue to violate the requirement to take and document corrective action after violations of stormwater effluent limitations is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**Count XI: Violations of Monitoring and Reporting Requirements Under the Clean Water Act**

332.    Each paragraph above is incorporated by reference as if fully set forth herein.

333.    Since April 2019, Defendants have failed and continue to fail to comply with their monitoring and reporting requirements at least thirty-seven times referenced in Table 11, paragraphs 237–273 above, in violation of Section I.F of the Permit.

334.    In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this provision of the Permit in the future unless enjoined from doing so.

335.    Each day that Defendants have violated or continue to violate the Permit's monitoring and reporting requirements is a separate and distinct violation of the Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court grant the following relief:

336.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that Defendants violated and remain in violation of, the Permit, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and applicable regulations as alleged in Counts I, II, III, IV, V, VI, VII, VIII, IX, X, and XI of this Complaint;

337.    Enjoin Defendants from violating the requirements of the NDPES Permit, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and applicable regulations;

338.    Impose civil penalties on Defendants up to $66,712 per day per violation for all violations occurring after November 2, 2015, and where penalties are assessed on or after December 27, 2023, pursuant to Sections 505(a) and 309(d) of the CWA, 33 U.S.C. §§ 1365(a), 1319(d), and its implementing regulations, 40 C.F.R. § 19.4;

339.    Award Plaintiff's costs of litigation, including reasonable attorney and expert witness

fees, as provided under Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

340.    Grant such other relief as this Court may deem appropriate.

Dated: June 10, 2024                          Respectfully submitted,

                                              /s/ *Ameya Gehi*
                                              Ameya Gehi
                                              BBO No. 709194
                                              Conservation Law Foundation, Inc.
                                              62 Summer Street
                                              Boston, MA 02110
                                              (617) 850-1795
                                              agehi@clf.org

                                              /s/ *Erica Kyzmir-McKeon*
                                              *Pro hac vice motion to be filed*
                                              Conservation Law Foundation, Inc.
                                              62 Summer Street
                                              Boston, MA 02110
                                              (617) 850-1763
                                              ekyzmir-mckeon@clf.org

                                              ATTORNEYS FOR PLAINTIFF